## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

       **v.**                           **Case Nos.**    **06-20175-JWL**

**GUILLERMO PENA-BAEZ,**

       **Defendant.**
_____

## MEMORANDUM AND ORDER

The indictment in this case charges defendant Guillermo Pena-Baez with possession with intent to distribute methamphetamine.  This matter is before the court on the defendant's Motion to Suppress (doc. #11) evidence obtained as a result of an allegedly unconstitutional search of a residence on October 14, 2006, which resulted in the discovery of methamphetamine and other incriminating evidence.  The court held an evidentiary hearing on the motion to suppress on April 2, 2007.  After careful consideration of the parties' arguments and the evidence, the court will deny defendant's motion to suppress.

**A.**     <u>**Background**</u>

On October 14, 2006, officer Greg Richardson with the Olathe Police Department received a call from Amy Grother, a police dispatcher, about an anonymous tip that there were two large bags of methamphetamine and a large amount of money in the closet of the

master bedroom of a residence located at 1105 East Loula in Olathe.  The anonymous informant had said that he or she believed Hugo Chavez was using the house to distribute methamphetamine, but that Mr. Chavez did not live there and instead was living in a hotel off of Shawnee Mission Parkway somewhere.  The person advised that they believed Mr. Chavez might be driving a dark colored Chevrolet Impala.  Ms. Grother further advised Officer Richardson that she had found a report from the Merriam Police Department involving Mr. Chavez and the defendant, Guillermo Pena-Baez, just six days prior on October 8, 2006.

After receiving the call from dispatch, Officer Richardson contacted officer Phillip Lewis with the Merriam Police Department.  Officer Lewis and another officer from the Merriam Police Department, Officer Johnson, had made a traffic stop of Messrs. Chavez and Pena-Baez on October 8.  Officer Lewis testified at the suppression hearing that on October 8, he and Officer Johnson stopped a tan Chrysler driven by Mr. Chavez with Mr. Pena-Baez as the one and only passenger.  In connection with the stop, the officers learned that Mr. Chavez had paid cash to rent a room for ten days at the Homestead Hotel.  During the stop, Mr. Chavez consented to the officers searching the vehicle.  Based on Officer Lewis's experience, he believed that the vehicle showed characteristics that indicated it was being used to transport illegal narcotics, although no drugs were found in the vehicle at that time. Officer Richardson testified that when he talked to Officer Lewis on October 14, Officer Lewis informed Officer Richardson about this information from the October 8 traffic stop.

2

Officer Richardson then started to drive by the house on Loula looking for some of the cars that were involved.  At first, he did not see the tan Chrysler or the dark colored Chevrolet Impala.  He drove by the house several times that evening.  At about 11:30 p.m., he drove by again and noticed a light on the bottom south side of the duplex that had not been on before.  Officer Richardson went to the door, knocked, and conversed with Mr. Pena-Baez.  At some point during the conversation, the two were joined by Officer Maxfield, also of the Olathe Police Department, who has a limited Spanish vocabulary.  A conversation ensued between the three of them which included two phone calls to an individual called "Nino."  Based on the conversation that transpired, the officers believed that they had the required consent to search the residence without a warrant.  When they searched the residence they found a large amount of methamphetamine, various items of drug paraphernalia, about $25,000 in cash, and an alcohol and drug education certificate in the name of Guillermo Pena.

In Mr. Pena-Baez's motion to suppress, he asks the court to suppress the evidence found as a result of the allegedly unconstitutional search of the residence.  He contends that whatever consent the officers were given to search the apartment was invalid because it was not given by someone with authority to consent to the search.  Additionally, Mr. Pena-Baez contends that, to the extent the officers relied on any alleged consent given by him, his consent was involuntary because of the language barrier between him and the officers.

**B.**      **Authority to Consent to the Search**

3

The Fourth Amendment generally prohibits the government from making a warrantless entry into a person's residence to search for specific objects. *Illinois v. Rodriquez*, 497 U.S. 177, 181 (1990). One of the exceptions to this general rule is when voluntary consent to the search has been obtained either from the individual whose property is searched or from a third party who possesses common authority over the premises. *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004). A third party's consent to search is valid if that person has either actual authority or apparent authority to consent to a search of the property. *Id.* A person has actual authority to consent to a search if he or she has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it. *Id.* The gravamen of the actual authority rule is that it is reasonable to recognize that a co-habitant has the right to permit the inspection in his or her own right, and the others have assumed the risk that one of their number might permit the common area to be searched. *Id.* Under the test for apparent authority, the Fourth Amendment is not violated when officers reasonably, although perhaps erroneously, believe that the person who consents to their entry has the authority to consent. *Id.* The test for determining the reasonableness of the officer's belief is an objective one; it is whether the facts available to the officer at the moment warrant a person of reasonable caution to believe that the consenting party had authority over the premises. *Id.* at 1222. Officers must evaluate the surrounding circumstances in order to determine whether a reasonable person would act upon the invitation without further inquiry. *Id.*

4

The conversation which allegedly resulted in the consent to search transpired as follows. When Officer Richardson arrived at the residence on Loula at approximately 11:30 p.m. that evening and noticed that a light was on, he contacted a patrol sergeant and requested a Spanish-speaking officer. He was informed that the best Spanish-speaking officer was Justin Maxfield. Officer Maxfield subsequently joined him at the scene. Officer Richardson, who was in plain clothes and in an unmarked car, went up to the door by himself and knocked on the door. He had instructed Officer Maxfield, who was in uniform and in a marked car, that, if the door was answered, Officer Maxfield should come join Officer Richardson. When Officer Richardson knocked on the door, Mr. Pena-Baez came to the door. Officer Richardson spoke to Mr. Pena-Baez in English. Officer Richardson asked if he could come into the house and talk to Mr. Pena-Baez, but Mr. Pena-Baez stated that it was not his house, it was a friend's house, and that it was not his house to give permission. During the conversation, Mr. Pena-Baez stated that Nino owned the house and that Nino lived upstairs. He said that Nino drove a dark colored, gold Chrysler. Meanwhile, Officer Maxfield came up to the residence to join them.

The two asked Mr. Pena-Baez to call Nino. Mr. Pena-Baez got his cell phone, dialed Nino's phone number, and gave the phone to Officer Maxfield. Officer Maxfield talked to Nino in English. Officer Maxfield asked Nino whose house it was; Nino said that it was not his house, that he had rented it two months ago, but that he had given it to Guillermo since then and he was no longer living there. The officers advised Mr. Pena-Baez that Nino said he had given the house to Mr. Pena-Baez and that Nino said it was not his and that he did not

5

live there.  Officer Richardson told Mr. Pena-Baez that if it was his house and he was staying

there, he could let the officers in.  Officer Richardson again asked Mr. Pena-Baez if he was

all right with that if Nino said it was his house.  Mr. Pena-Baez continued to insist that it was

not his house, that he did not live there, that he was just staying there, and that he lived in

Kansas City, Kansas.

    The officers continued to attempt to clarify the situation with Mr. Pena-Baez.  The

officers asked if they called Nino back and if Nino was good with them going through the

house, if Mr. Pena-Baez would be good with it.  Mr. Pena-Baez "shook his head yes, grabbed

his phone, dialed Nino's phone number, and gave it to Officer Maxfield to call him back."

Officer Maxfield once again spoke with Nino during the second phone call to him.  Officer

Maxfield again asked Nino if he lived there.  Nino again said no and said that he did not own

anything in the house.  Officer Maxfield asked Nino if he was still the leaseholder of the

residence and Nino stated that he was.  Officer Maxfield then asked if they could go through

the house.  Nino agreed to the officers going inside the residence but, again, elaborated that

he had moved out and that nothing in the residence was his.  The officers then communicated

to Mr. Pena-Baez that Nino said "yes," but that it was not his house.  Officer Richardson

again asked Mr. Pena-Baez if it was his house.  He said no, but further stated that when he

stayed there he stayed on the bottom level and when Nino stayed there he stayed on the top

level.

    Officer Richardson then entered the residence.  Mr. Pena-Baez did not attempt to stop

him.  Officer Richardson performed a protective sweep of the residence, looking for places

where someone could be hiding.  Meanwhile, Mr. Pena-Baez sat on the steps without interrupting the officers or objecting to what they were doing.  The officers discovered the evidence which Mr. Pena-Baez now seeks to suppress and placed Mr. Pena-Baez under arrest.

During oral argument, counsel for defendant conceded that Mr. Pena-Baez could give consent to the search.  The court agrees.  Notwithstanding Mr. Pena-Baez's protestations that the residence was not his, he admitted that he stayed there and that when he did so he stayed in the downstairs, or lower level, bedroom.  Furthermore, the evidence reflects that Mr. Pena-Baez must have had a key giving him access to the residence because the residence was empty all evening until 11:30 p.m. when Officer Richardson found Mr. Pena-Baez there.  In light of his access to and use of the residence, he had actual authority to consent to the search.  *See Kimoana*, 383 F.3d at 1222 (overnight guest who had access to motel room had actual authority to consent to search, even though he was not the registered renter of the room).  The more pivotal issue, according to defendant, is whether Mr. Pena-Baez did in fact consent to the search.

The court finds that Mr. Pena-Baez consented to the search.  Mr. Pena-Baez continued to insist that the residence was Nino's.  The officers asked Mr. Pena-Baez if they could go through the house if Nino said they could.  He "shook his head yes" and called Nino so they could talk to him.  Nino consented to the officers searching the residence.  The officers relayed this information to Mr. Pena-Baez, then proceeded to enter the residence and conduct a protective sweep.  The fact that Mr. Pena-Baez made no attempt to revoke his conditional

consent or to object to the officers searching the residence provides further evidence that their actions were consistent with his understanding that he had consented to the search because Nino gave the officers permission to enter the apartment. Consequently, the court finds that Mr. Pena-Baez had actual authority to consent to the search and, in fact, did so.

### C.   Voluntariness of the Consent

The court turns, then, to Mr. Pena-Baez's argument that his consent was involuntary because of the language barrier between him and the officers. Consent is valid only if it is freely and voluntarily given. *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006). The voluntariness of consent is a factual issue based on the totality of the circumstances. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Two conditions must be met for consent to be valid: "(1) There must be a [sic] clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *Id.* (quotation omitted).

Here, the evidence establishes that Mr. Pena-Baez's consent was unequivocal, specific, and freely given without duress or coercion. Mr. Pena-Baez's consent was unequivocal and specific, as he stated that if Nino agreed to the officers entering the apartment (which he did), they could do so. It was also freely given. Mr. Pena-Baez demonstrated that he knew how *not* to give consent when he repeatedly made statements to the effect that the residence was not his to give permission to search and that the residence

8

was Nino's. Then, when the officers finally entered the residence, he raised no objection to their protective sweep. *See United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999) ("A defendant's silence and acquiescence may support a finding of voluntary consent."). Moreover, the record does not reveal any duress or coercion placed on Mr. Pena-Baez. It appears that the entire encounter was a relatively peaceful one. The officers asked questions of Mr. Pena-Baez, which he then answered. He even used his cell phone to call Nino on the phone for them.

Mr. Pena-Baez's sole argument that his consent was not voluntary is that he did not understand the confusing conversations. Certainly, the existence of a language barrier can vitiate consent. *See United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (explaining that "language barriers may inhibit a suspect's ability to [act] knowingly and intelligently"). But, the Tenth Circuit has held that in cases involving language barriers a "working knowledge" of the English language is all that is required for a consent to be voluntary. *United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir. 2003); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001). Such a working knowledge of the English language exists if the individual has "'sufficient familiarity with the English language to understand and respond' to the officer's questions." *Manjarrez*, 348 F.3d at 886 (quoting *Zubia-Melendez*, 263 F.3d at 1163); *see also United States v. Corral*, 899 F.2d 991, 994 (10th Cir. 1990) (finding a defendant with limited knowledge of English voluntarily consented to search because he understood the officer's questions, answered questions in English, and demonstrated an overall working knowledge of English).

In this case, the court has no difficulty concluding that Mr. Pena-Baez possessed the required working knowledge of the English language for his consent to be voluntary. Perhaps the most persuasive evidence on this issue is the testimony of Officer Lewis with the Merriam Police Department, who was not even involved in the search of the residence on Loula in Olathe on October 14. Officer Lewis testified that during the traffic stop on October 8, he and Mr. Pena-Baez spoke in English during the entire conversation. Turning to the events of October 14, Officer Richardson testified that he initially spoke to Mr. Pena-Baez in English. Mr. Pena-Baez professed not to speak English for the first time only when the officers started asking him about drugs. It was at that point that Officer Maxfield began talking to him in Spanish. Officer Maxfield testified that when he asked Mr. Pena-Baez in Spanish if the officers could search the residence, he was not able to understand Mr. Pena-Baez's response in Spanish. Eventually, Mr. Pena-Baez ended up telling them in English that it was not his residence so he could not let the officers search it. Officer Maxfield testified that their conversation was primarily in English. Officers Richardson and Maxfield both testified that when they were speaking to Mr. Pena-Baez in English he always responded to their questions appropriately. Officer Maxfield specifically testified that he had an "intelligent conversation" with Mr. Pena-Baez.

The court discounts the evidence which Mr. Pena-Baez contends indicated he did not have the requisite working knowledge of English to make his consent voluntary. The fact that Mr. Pena-Baez did not profess to understand the officers until they began asking him about drugs was rather dubious timing. Counsel for Mr. Pena-Baez also pointed out that

Officer Richardson testified that Officer Maxfield's conversations with Mr. Pena-Baez were in Spanish and that his incident report stated that Officer Maxfield spoke with Mr. Pena-Baez in Spanish.  The court does not believe, however, that the discrepancy between Officer Maxfield's testimony, Officer Richardson's testimony, and Officer Richardson's report concerning the extent to which the conversation transpired in Spanish is as great as defense counsel contends.  Officer Richardson's report is not clear concerning the duration Officer Maxfield spoke to Mr. Pena-Baez in Spanish.  All it states is that Mr. Pena-Baez initially answered Officer Richardson's questions in broken English, that when Mr. Pena-Baez was asked about drug activity he advised that he did not understand and could only speak English, and "Officer Maxfield then began talking with Guillermo in Spanish."  Def.'s Ex. 401.  The report does not state how long Officer Maxfield continued to talk with Mr. Pena-Baez in Spanish or whether the conversation reverted to English at some point.  Thus, the report is vague and ambiguous concerning the extent to which the conversation transpired in English or Spanish.  The fact that Officer Maxfield began speaking to Mr. Pena-Baez in Spanish when Mr. Pena-Baez was questioned about drug activity is consistent with Officer Richardson's testimony on this point.  Other than the fact that Officer Maxfield talked to Mr. Pena-Baez about drug activity in Spanish, Officer Richardson's testimony was not clear about the extent to which Officer Maxfield spoke to Mr. Pena-Baez in Spanish about other subjects.  For example, he testified that he could catch parts of their conversation, but he was not able to follow it.  Ultimately, to the extent that it could be inferred from Officer Richardson's testimony that Officer Maxfield talked to Mr. Pena-Baez in Spanish more than

11

Officer Maxfield testified he talked to Mr. Pena-Baez in Spanish, the court believes that Officer Richardson's recollection on this point was simply faulty, as Officer Maxfield likely would have had a more accurate recollection of this detail because he is the officer who spoke to Mr. Pena-Baez in Spanish.  In sum, the court does not agree with Mr. Pena-Baez's characterization of the evidence on this point and, additionally, the court is persuaded by the other evidence, discussed previously, that Mr. Pena-Baez had sufficient familiarity with the English language to understand and respond to the officers' questions.  Consequently, the court believes that in light of the totality of the circumstances his consent was freely and voluntarily given.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Pena-Baez's Motion to Suppress (doc. #11) is denied.

**IT IS SO ORDERED** this 9th day of April, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

12